1

1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3
   UNITED STATES OF AMERICA,       ) Docket No. 21 CR 361
4                                  )
                        Plaintiff,)
5                                  )
                vs.                )
6                                  )
   ERNESTO HERRERA,                ) Chicago, Illinois
7                                  ) June 7, 2021
                        Defendant.) 1:00 o'clock p.m.
8

9      TRANSCRIPT OF PROCEEDINGS - TELEPHONIC DETENTION HEARING
         BEFORE THE HONORABLE BETH W. JANTZ, MAGISTRATE JUDGE
10

11  TELEPHONIC APPEARANCES:

12
   For the Plaintiff:          HON. JOHN R. LAUSCH, JR.
13                             United States Attorney
                               BY:  MR. PATRICK M. MOTT
14                             219 S. Dearborn St., Suite 500
                               Chicago, Illinois  60604
15

16  For the Defendant:          FEDERAL DEFENDER PROGRAM
                               BY:  MS. JASMINE JOHNSON
17                             55 East Monroe Street, Suite 2800
                               Chicago, Illinois  60603
18

19  Also Present:              MS. CARLA TRAMONTE,
                                 Pretrial Services
20                             MR. JORGE CARBAJOSA, Interpreter

21
   Court Reporter:            MR. JOSEPH RICKHOFF
22                            Official Court Reporter
                              219 S. Dearborn St., Suite 2128
23                            Chicago, Illinois  60604
                              (312) 435-5562
24            * * * * * * * * * * * * * * * * *
                      PROCEEDINGS RECORDED BY
25                    MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED BY COMPUTER

1          (Proceedings had in open court, via telephone conference:)

2              THE CLERK:  21 CR 361, USA vs. Ernesto Herrera.

3              THE COURT:  Good afternoon, everyone.  This is Judge

4     Jantz.

5              I'll let everyone put their introductions on the

6     record.  We'll start with government counsel first.

7              MR. MOTT:  Good afternoon, Patrick Mott on behalf of

8     the United States.

9              THE COURT:  Okay.

10              And how about for defense?

11              MS. JOHNSON:  Good afternoon, Jasmine Johnson,

12     Federal Defender Program, here on behalf of Mr. Herrera, who

13     is present on the line.

14              THE COURT:  Okay.

15              Mr. Herrera, can you hear us okay?

16              THE DEFENDANT:  Yeah.

17              THE COURT:  Okay.  Very good.

18              Do we have a Pretrial Services officer on?

19              MS. TRAMONTE:  Good afternoon, Carla Tramonte,

20     Pretrial Services.

21              THE COURT:  Thanks, Officer.

22              Do we have an interpreter on, as well?

23              THE INTERPRETER:  Good afternoon, your Honor, this is

24     Jorge Carbajosa, the Spanish interpreter.

25              I am interpreting simultaneously for the -- for

1   Mr. Herrera, the father of defendant, who is listening to me

2   on another phone line.

3          THE COURT:  Fantastic.  That was going to be my first

4   question.  Sometimes you just -- you translate a certain part

5   of the hearing.  For this one I would like his father to be

6   able to hear the entire hearing.  But it sounds like we're

7   already set to do that.

8          Is that right?

9          THE INTERPRETER:  The interpreter is interpreting

10  everything to the defendant simultaneously, and you will hear

11  him on the phone right now.

12      (Brief pause.)

13         THE INTERPRETER:  The interpreter seems to have lost

14  him, but he's still on the phone with me.

15      (Brief pause.)

16         MR. HERRERA, SR.:  Okay.  I do hear you.

17         THE COURT:  Can you ask him if he's able to hear

18  the -- well, let me put it this way:  As long as you can hear

19  me and you tell him what's going on, right, he'll be able to

20  hear that and you can verify that he's listening; is that

21  right?

22         MR. HERRERA, SR.:  Yes, I do hear you.

23         THE COURT:  Okay.

24         If you can, just translate everything for Mr.

25  Herrera's father.

1          THE INTERPRETER:  The interpreter is interpreting

2     everything simultaneously.

3          THE COURT:  Great.  Thank you so much.

4          Okay.  So, this is Mr. Herrera's continued bond

5     hearing, continued from his initial appearance late last week.

6     As with that initial appearance on removal proceedings, he

7     does have a right to an in-person hearing.  We understand from

8     his counsel Ms. Johnson he's willing to waive that and proceed

9     telephonically.

10          Is that the case, Ms. Johnson?

11          MS. JOHNSON:  That's correct.

12          THE COURT:  Okay.  Very good.  With Mr. Herrera's

13     consent, we will proceed telephonically.

14          I would note for the record that the courtroom in

15     which we're proceeding in the courthouse is open to the

16     public.  And this is a public call line, as well.  Any member

17     of the public who would like to listen is certainly free to do

18     so.

19          Before we get to detention and bond arguments, I want

20     to address some initial matters first.  So, I just want to

21     confirm what I've received on the case so far and confirm that

22     both sides have that, as well.

23          So, I have both the original Pretrial Services

24     report, along with an addendum.

25          Thank you, Officer, for doing those so quickly.

1          I also have from Mr. Mott the victim's statement

2    written by the mother of Minor A, I believe.

3          Is there anything else I should have?

4          And I just want to confirm that both counsel have

5    seen all of that.

6          MR. MOTT:  This is Patrick Mott.

7          I don't believe there's anything more that the

8    government submitted.

9          MS. JOHNSON:  This is Jasmine Johnson.

10          Yes, your Honor, I have received the statement that

11    the government provided.

12          THE COURT:  Okay.  And did you see the Pretrial

13    Services original report, as well as the addendum, Ms.

14    Johnson?

15          MS. JOHNSON:  Yes, I did.  Thank you.

16          THE COURT:  Very good.

17          The next thing I want to address is because this is a

18    removal to another district, there is a process by which that

19    other district could appeal if I decided to release Mr.

20    Herrera.  I've made no conclusion on that yet.  My

21    understanding is the District of Massachusetts has indicated

22    that it would appeal any release order.  And, so, I wanted to

23    talk about the logistics of that to make sure everyone's on

24    the same page.

25          So, Mr. Mott, if you could bring us up to speed from

 1    your standpoint, and I'll certainly hear from Ms. Johnson on

 2    that, as well.

 3              MR. MOTT:  Yes, your Honor.  The U.S. Attorney's

 4    Office for the District of Massachusetts has informed me that

 5    they would appeal a release order and would request a 72-hour

 6    stay.  I'm aware that your Honor, during the last hearing,

 7    indicated that a 24-hour stay is possible.  The U.S.

 8    Attorney's Office for the District of Massachusetts also

 9    requested that if there is a release order, that it be entered

10    as quickly as possible to allow them to lodge their appeal as

11    quickly as possible.

12              THE COURT:  Okay.

13              Ms. Johnson?

14              MS. JOHNSON:  Your Honor, the government relayed to

15    us last Friday that the District of Massachusetts would be

16    filing their appeal within 24 hours.  So, we will object to an

17    extended stay in this matter.

18              THE COURT:  Okay.

19              So, here's what I'd like to do on that.  One, let me

20    make clear that whether or not another district would appeal

21    any release order does not affect my thinking or findings in

22    the case.  Rather, to me it's a logistical issue and one that

23    I raise because I think particularly the defense should have

24    an opportunity to know what kind of time frame they're looking

25    at.

1           My understanding here is that the U.S. Attorney's
2   Office in the District of Massachusetts will be requesting a
3   transcript -- expedited transcript -- which seems eminently
4   reasonable to me.  It would benefit that district and
5   particularly the judge out there who would be considering
6   this.
7           So, what I would do is as follows:  I would stay the
8   release order for 48 hours from entry of the order.  We have
9   an extremely busy week this week.  So, I would love to say we
10  can get out the order right away, but it just can't always
11  happen.  It would be 48 hours from any release order.
12          And my thinking on 48 hours is that gives essentially
13  about 24 hours for the transcript to be prepared, which is
14  really short as it is -- our court reporters are super busy,
15  but at least it would give some time -- and then 24 hours for
16  the U.S. Attorney's Office to prepare any appeal.
17          So, that's how we work it if there's a release order.
18  We're not there yet, and I've made no conclusions.
19          Any questions about how that would work?
20          MS. JOHNSON:  Your Honor, this is --
21          MR. MOTT:  Not from the government.
22          MS. JOHNSON:  -- Jasmine --
23          THE COURT:  Go ahead, Ms. Johnson.
24          MS. JOHNSON:  My apologies.
25          We would just like to note our objection for the

1    record.

2              THE COURT:  Certainly understood.  Thank you for

3    that, Ms. Johnson.

4              Okay.  So, the next --

5              Mr. Mott, any questions on logistics of how that

6    would work?

7              MR. MOTT:  No, your Honor.

8              THE COURT:  Okay.

9              Turning to the merits, I have some initial questions.

10   I will tell you that I'm going to give as fulsome of argument

11   as everyone would like here.  But I have some initial

12   questions that I -- well, I will tell you this:  There will be

13   no decision on release today.  And the reason for that is it's

14   an incredibly serious case.  So, I want to make sure that

15   anyone who is stepping up to be a third-party custodian here

16   is fully aware of what the Court would be expecting of him or

17   her, and fully aware of what the nature of the case is.  And

18   that's something that I think folks should have a little bit

19   of time to think about.

20             So, there will be no release decision today.  But I

21   do have some initial questions that I want to go through.  And

22   what I want to preview for you is if I was going to release

23   Mr. Herrera, here's the things I would be looking for.  And,

24   so, the family needs to think about whether or not they're

25   willing to step up and do that.

1           I'm not making any conclusions yet because I have not

2     even given Mr. Mott an opportunity to fully argue it, as I

3     will.  But I just think for efficiency's sake, I want to raise

4     for you some questions I have.

5           But let me start going through those.  If you know

6     the answer now, great, please share it.  If you say, "Judge, I

7     need time to look into that," that's okay, too.  What I'm

8     trying to do here is -- it's a very serious case, and I want

9     to make sure all of us have had full information as best as we

10    can so that I can make the best decision I can in the case.

11          Let me start going through my questions.  So,

12    questions (audio transmission distorted) just so we can tailor

13    arguments here.

14          So, one -- and this is I'm looking at the Pretrial

15    Services addendum.  Mr. Herrera's sister helpfully -- and I

16    appreciate her stepping up and being willing to be a

17    third-party custodian.  I would exclude her from consideration

18    because she is expecting a child next month.  And given that

19    this is a case involving a charge of sexual exploitation of

20    children and receipt of child pornography, I would not

21    consider placing Mr. Herrera in any home that has any minors

22    in it, including a baby.  I do thank your sister for stepping

23    up on that.

24          The next question I have is with respect to the

25    parents' residence.

1            Officer Tramonte, if you could answer this one for

2     me.  I just want it clear from the two reports -- thank you

3     again for doing those -- with respect to the parents'

4     residence, is there a school near there?  I just couldn't make

5     out -- sorry, I was kind of losing track of which residences

6     were which.  But if you could tell me what's near the parents'

7     residence.

8            MS. TRAMONTE:  Yes, your Honor.

9            According to the Chicago Police Department unit, they

10    said that Bowen High School is within 500 feet, which they

11    said is specifically two blocks from the parents' residence.

12    So, it is not a registerable address, according to their

13    policy.

14            THE COURT:  Okay.  All right.  I can see that on the

15    original report.  I just wanted to match that up.

16            And I take it that while it would not exclude that

17    address from consideration because Mr. Herrera is not a

18    convicted sex offender anyway at this point, it's for my

19    information?  Do I have that correct?

20            MS. TRAMONTE:  It is for your information.  It will

21    be an effective -- if there is a conviction.  However, it's

22    also for consideration as to the age of the children in school

23    balanced with the age of the alleged offense.

24            THE COURT:  Very good.  Thank you, Officer.

25            So, growing out of that, I can tell you I would not

1  consider releasing Mr. Herrera except on home incarceration

2  with location monitoring.  So, when we think about it --

3         And, again, Mr. Mott, I'm not going to cut off any

4  argument from you or Ms. Johnson, but I just wanted to lay out

5  some considerations up front here to focus our efforts.

6         Given that the Bail Reform Act requires reasonable

7  assurance of the safety of the community -- and this case

8  involves allegations of electronic communication with

9  minors -- it would be the Court's view that we would need the

10  most restrictive conditions possible to achieve reasonable

11  assurance, and that would include home incarceration.  So,

12  Mr. Herrera would not be allowed to go out and work.  He'd be

13  in his house 24/7.

14         Further -- and this will be something -- let me ask

15  Ms. Johnson.

16         Is Mr. Herrera's girlfriend on -- I saw her name

17  here.  I want to use her proper name to be respectful.

18  Ms. Artiago.

19         Is Ms. Artiago on, Ms. Johnson?

20         MS. JOHNSON:  Your Honor, I'm not --

21         MS. ARTIAGO:  Yes.

22         MS. JOHNSON:  -- a hundred percent -- okay.  She is.

23  She just answered.

24         THE COURT:  Okay.  Very good.

25         Thank you for joining us, ma'am.

1          So, again, in terms of managing expectations here, I

2     would not permit Mr. Herrera to live in the -- what I

3     understand to be the building, but there's separate units.  I

4     would require Mr. Herrera to live with his parents and not

5     live with his girlfriend.

6          Further, I would require all familial folks in the

7     house to not have Wi-Fi.  I understand there's non-familial

8     tenants and there's nothing we can do about that, although it

9     will be a consideration for me.  But any familial tenants in

10    the house -- the parents, Ms. Artiago -- I would require that

11    there be no Wi-Fi in the house and, in fact, any Wi-Fi

12    hardware be removed.  Why is that?  Because at that point with

13    limiting electronic devices to just cellular service, you have

14    much greater control with electronic devices.

15         That's another thing I would want everyone to think

16    about, is whether they're willing to have Mr. Herrera live

17    with his parents in their unit, and that both his parents and

18    Ms. Artiago would not be permitted to have Wi-Fi on the

19    premises.

20         On the topic of electronic devices, this question is

21    for Mr. Mott:  You may have planned to work this into your

22    argument, but I am interested in what is the government's

23    forensic evidence with respect to what devices may have been

24    used for these alleged crimes, if they know.  Sometimes the

25    government can't tell.  It looked like there was at least some

1  connection -- I was looking at the complaint -- there was some

2  connection to at least T-Mobile service.

3       But, Mr. Mott, do you know if it's the government's

4  position or they have evidence there were any devices used

5  beyond a T-Mobile, which presumably would be a cellular phone.

6  If, again, you don't know, Mr. Mott, you can check, but I just

7  wanted to raise that as an initial question.

8       MR. MOTT:  Your Honor, I would have to check, but I

9  can say that the defendant did give a Mirandized interview;

10  and during that, he did say that he used -- that there at one

11  point was a laptop computer in the home that he had used to

12  communicate with individuals who would provide him with

13  images.  He said he was no longer using that device, and that

14  the family may have gotten rid of it.  I don't know yet what

15  the search of the premises turned up with respect to that.

16       But given that many of the communications in this

17  case were over Snapchat and by text message, we do believe

18  that most of the sensitive communications here were with the

19  mobile device.

20       THE COURT:  All right.

21       On that point, Mr. Mott, so, if you're able to -- if

22  you know and can share this point, but if you could let me

23  know what unit or units were searched and presumably -- what

24  I'm getting at here is I want to cut down the possibility, if

25  I did release Mr. Herrera, that he has any access to any

1   electronic device with Internet capability.  And I don't want

2   to just take people's word for it.  I really want to dig into

3   this and make sure we're being as careful as we can be.

4          Tell me what was searched and whether there was

5   permission to take all electronic devices.  I'm just trying to

6   get at what might still be in the home.

7          MR. MOTT:  Yes, your Honor.

8          I can tell you that the only premises that was

9   searched pursuant to a search warrant was the downstairs unit

10   in which Mr. Herrera lives, not the upstairs unit in which the

11   parents are living.

12          THE COURT:  Okay.

13          MR. MOTT:  And also the -- with respect to devices

14   within Mr. Herrera's unit, the search warrant restricted the

15   agents to only taking devices that were reasonably believed to

16   be -- belong to or be used by the defendant.  So, that would

17   not have included Ms. Artiago's device.

18          THE COURT:  Okay.  Very good.

19          So, on that point, we do have -- I wouldn't say an

20   unusual situation.  It's very common here in Chicago where you

21   have multi-unit buildings.  But given the nature of the

22   charges here, I would require, as I said, no Wi-Fi and no

23   Wi-Fi hardware at any of the familial tenants.  That would

24   include the parents, as well as Ms. Artiago.  And I'd further

25   require -- I want to do this:  I'd like Officer Tramonte to

1    interview Ms. Artiago to find out what electronic devices are

2    still in her unit.

3            I would allow a personal cell phone, and I would

4    allow -- there's a work laptop, but I'm not going to allow

5    Wi-Fi.  So, I think that needs to be inquired into.  And we

6    can sort of set up the logistics for that at the end of the

7    hearing, but I just want to, again, flag for them what I'm

8    thinking about here.

9            Given the proximity of a school, in addition to home

10   incarceration, I would require Mr. Herrera's father to be with

11   Mr. Herrera, the defendant, at all daytime hours -- there's a

12   belt and suspenders here -- that Mr. Herrera is not leaving

13   the home.  I see that Mr. Herrera's retired, but obviously

14   want to have a -- have an opportunity to consider whether

15   they're willing to do the things that the Court would ask

16   here.

17           My next question is, Ms. Johnson, if you know, I did

18   see in the Pretrial Services report that at least up to June

19   6th there was some minors residing with Mr. Herrera's parents.

20   Have they now left town?  What's the plan?  If you can bring

21   me up to speed on that, Ms. Johnson.

22           MS. JOHNSON:  Yes, your Honor.

23           It's my understanding that they were just visiting.

24   They have since left.  There's no minors in the entire

25   building whatsoever.

1          THE COURT:  Okay.  Thanks for that update.

2          Those are my questions.  And at that point, I'll, of

3  course, let both sides argue and we'll do formal argument.  As

4  I said, at the end of this hearing, I'm not going to make a

5  ruling because I want the family members to have a fair

6  opportunity to consider, if I were to release Mr. Herrera, all

7  of what's being asked of them.  I mean, it's only fair.  And

8  it's the best way to make sure people are properly prepared to

9  meet what the Court would demand of them if there was a

10 release here.

11         So, we would be taking an adjournment to a different

12 day to consider that, discuss it as a family, and also for

13 Officer Tramonte to interview Ms. Artiago about what

14 electronics are in that home.

15         So, let me start, then, with the formal argument.

16         So, given the nature of the charges in this case,

17 Ms. Johnson, any dispute from the defense that there is a

18 rebuttable presumption that applies here?  It is rebuttable,

19 but it is a presumption case.

20         MS. JOHNSON:  Your Honor, that is correct.  This is a

21 presumption case.

22         THE COURT:  Okay.  Very good.

23         And, Mr. Mott, if you could put on the record on what

24 grounds the government is moving for detention.

25         MR. MOTT:  Yes.  The government is moving for

1    detention on the grounds that no combination of conditions

2    could reasonably assure either the safety of the community or

3    the defendant's appearance in court in Boston.

4          THE COURT:  Okay.

5          Given that this is a presumption case, I'll -- so,

6    the burden is on the defendant to rebut that presumption if it

7    thinks they can do so.  I'll allow Ms. Johnson to argue first.

8    Then I'll turn it over to Mr. Mott.

9          But as I said, I'm not going to cut off anyone here.

10   As long as we need to take argument, we'll obviously do that.

11         So, Ms. Johnson, why don't you start your

12   presentation argument, please.

13         MS. JOHNSON:  Thank you, your Honor.

14         The Bail Reform Act of 1984 identifies several

15   factors that this Court should consider when making a pretrial

16   release decision.  And those factors include the nature and

17   circumstances of this offense, criminal history, length of

18   residence in the community, employment, and family ties.

19         Your Honor, we -- as the Court knows, we're not at

20   the guilt or innocence phase.  Mr. Herrera understands the

21   seriousness of these allegations.

22         With that being said, there are some points here that

23   the Court should consider.  The first being that Mr. Herrera

24   does not have a criminal history.  He is a lifelong resident

25   of Chicago.  He has a solid work history, and his

1    employment -- current employment -- is outlined in the first

2    Pretrial report.

3            We do have on the line his -- both of his -- parents,

4    his girlfriend and his sister, as well.  There is family

5    support there.  I've had conversations with both of the

6    parents and the girlfriend last week and also the sister last

7    week.  And the sister and I had a hour-and-a-half conversation

8    late yesterday about this case.  They all understand what the

9    allegations are.  They understand the responsibilities and

10   what is being required.  There are alternatives here to secure

11   detention that would mitigate any danger to the community and

12   risk of flight.

13           And, your Honor, concerning risk of flight, Mr.

14   Herrera does have a U.S. passport.  It is in the custody of

15   his mother.  We would turn that over to Pretrial Services as

16   soon as possible.  In agreement with the recommendation of

17   Pretrial, we do propose that Mr. Herrera be allowed to travel

18   to the charging District of Massachusetts to answer for these

19   charges.

20           And we have also reviewed the conditions that were

21   set forth by Pretrial.  We do propose that his father, Ernesto

22   Herrera, who is present on the line, to be appointed as the

23   third-party custodian.  With the proposed conditions that the

24   Court outlined, Mr. Herrera would be in agreement to home

25   incarceration; also, the computer restrictions, as well.

1          I did review the Adam Walsh Act.  That only applies

2     to sex offenders, as the Court is aware of.  Mr. Herrera is

3     not a registered sex offender.  With that being said, he does

4     understand, his family understands the seriousness of these

5     allegations.

6          If the Court doesn't have any questions at this time,

7     that would conclude my argument.

8          THE COURT:  Okay.  Thanks, Ms. Johnson.

9          I'll let Mr. Mott argue; then give you response.

10         And, Mr. Mott, you'll get the same opportunity.

11         So, Mr. Mott, don't you go ahead with your argument,

12    please, sir.

13         MR. MOTT:  Thank you, your Honor.

14         The defendant is charged with two different offenses

15    that give rise to presumption here, both sexual exploitation

16    of children, in violation of Section 2251, and receipt of

17    child pornography, in violation of Section 2252A.

18         The government respectfully submits that in light of

19    the way in which the offense of sexual exploitation of

20    children was committed in this case, that the defendant cannot

21    rebut the presumption.  And, particularly, that is because the

22    defendant has shown that he was able and willing to target

23    vulnerable victims across the country using an easily

24    concealed mobile device from the safety of his own home.

25         And he showed that he was adept at creating multiple

1    accounts with anonymous names, anonymous phone numbers in

2    order to conceal his actions; and that he did this in the very

3    same residence or in the same property in which he would be

4    incarcerated on these proposed conditions, living directly

5    below his parents, one of whom would be the proposed

6    third-party custodian; and that the defendant showed that he

7    was able and willing to conceal his actions from those members

8    of his own family for a lengthy period of time.

9         It's compounded in this case by the fact that this is

10   a removal, and that the defendant would need to appear in

11   Boston and would need to travel to Boston, during which time

12   necessarily some of these stringent conditions that we're

13   talking about would not as effectively be able to be

14   implemented or kept in place just due to the logistics of

15   allowing someone to travel across the country to a place where

16   he has no familial ties and no employment and no connection to

17   the community.

18        So, the government does respectfully submit that the

19   presumption here is not rebutted.  But even if the presumption

20   is found to be rebutted, the fact this is an offense involving

21   a minor victim, both of these are -- the fact that they're

22   both presumption offenses are still to be weighed as evidence

23   when weighing the 3142(g) factors.

24        The government is moving on both the grounds that the

25   defendant poses a danger to the community and a risk of

1   non-appearance.

2          With respect to danger to the community, we submit

3   that, by clear and convincing evidence, no combination of

4   conditions can assure the safety of the community.  And I'll

5   start with the danger to the community argument.

6          First, turning to the nature and circumstances of the

7   offenses in this case, particularly starting with the

8   exploitation of children offense, Section 2251, that involves

9   the exploitation of child, one of the greatest dangers to the

10  community imaginable.  And in this case, the violation alleged

11  is exceptionally egregious.

12         And, as I'm sure the Court has reviewed, you need

13  look no further than the text messages that are detailed in

14  the complaint to see that the defendant was threatening the

15  individual identified as Minor A with disclosure of nude and

16  compromising videos of herself, and was demanding that she

17  create new material for him even while at work.

18         The defendant also was directly put on notice that

19  the defendant was a minor, that she was 16.  And this did

20  not -- sorry, that the victim was a minor and was 16.  And

21  this did not in any way deter the defendant, who followed up

22  again asking for more photos of the minor engaged in sexual

23  acts with other individuals.

24         Also, in these text messages, you can see plainly

25  that in the defendant's own words, in his text messages to the

1   victim, the defendant indicated that he was working with

2   others or was in coordination or communication with others who

3   he referred to as masters.  It indicates that the defendant

4   was aware that there were others out there who were also

5   exploiting this victim.  And he was at least willing to

6   suggest to victims that he was working with others, which also

7   increases the danger both to the victim in this case and to

8   the community at large because that implies the possibility

9   that there are other individuals out there who the defendant

10  is able to communicate with, are not -- have not been

11  identified by the government, are not subject to the

12  conditions that we're talking about, and may be incented to

13  either help the defendant in some way or to intimidate

14  victims.

15         So, all that comes from the defendant's own words in

16  the text messages that he sent to this one victim.  His

17  statements to Minor A, as detailed in the complaint, also

18  indicate that the defendant had been reviewing Minor A's

19  Snapchat account for some time before he reached out to her

20  with the 8121 number on June 4th, 2020.  He indicated a

21  significant familiarity with the various video files,

22  exploitative files and images that were on that account,

23  including images involving Minor A with a dog.

24         And in the defendant's Mirandized recorded interview,

25  which has been produced to the defense, the defendant did

1    admit that he began communicating with Minor A through her

2    Snapchat account as early as approximately February or March

3    of 2020.

4           In that interview, the defendant also admitted that

5    he was similarly targeting others.  And in his own words, he

6    said that he had communicated threats of this type to four or

7    five other females in an attempt to coerce them into providing

8    him with nude images.  And, so, by threats, I mean the same

9    type of threats that we're talking about with respect to Minor

10   A, telling them that he is in possession of their nude photos

11   and in possession of their contacts, and is willing to share

12   these photos with all of their contacts, with their family in

13   a way that would be intended to embarrass, shame them, destroy

14   their lives, so as to convince them to provide him with

15   additional photos.

16          So, this conduct, as admitted by the defendant, was

17   not limited to Minor A.  And that significantly increases the

18   danger to the community here.

19          And briefly, the government has provided search

20   warrant returns from the defendant's Snapchat account that

21   include some of those communications.  And we just want to

22   talk about two quick examples.

23          In one of those communications, the user with whom

24   the defendant was communicating stated that she was a young

25   mom, 17 years old, who was suffering from depression.  And in

 1   another one, the user indicated that she was 17 years old.

 2   And in response, the defendant said that he would expose her

 3   to her family, and that her mother was going to kill her.

 4            So, again, similar modus operandi to what the

 5   defendant did with respect to his communications with Minor A

 6   that is more widespread than with respect to just one

 7   individual.

 8            In his recorded interview, the defendant also said

 9   that he engages in this conduct because he has a -- an

10   addiction or a compulsion related to masturbation that

11   requires him to masturbate multiple times per day; it's

12   something that he cannot control; and it is to the extent

13   where he engages in that behavior while at work.  And that he

14   has a need to continue obtaining new images to satisfy that

15   compulsion; and that those new images need to come directly

16   from the women depicted in them; and that that is why he

17   continued to reach out directly to minor victims like Minor A

18   demanding that they give him additional existing photos or

19   produce new material for him.

20            This also enhances the danger to the community

21   because in the defendant 's own words, this is a compulsion

22   that he cannot -- that he has demonstrated no ability to

23   control.  And, so, there is a significant -- a very

24   significant -- risk here that this conduct will continue

25   because the defendant has demonstrated no ability to control

1    this conduct to date, and this conduct has been going on for

2    some time.  And he has been willing to put himself at

3    significant risk to do it.  And he's continued to obtain these

4    images even when told directly that the people who are

5    providing them to him are minors and are struggling and are

6    depressed.

7          So, all to show the danger to the community

8    associated with the nature and the circumstances of the

9    offense here.

10          I'll touch briefly on the weight of the evidence,

11   which is not considered by Pretrial in its order.  And the

12   evidence is, I think, laid out well in the complaint in terms

13   of showing the Court how law enforcement was able to trace

14   these communications -- both the Snapchat account and the text

15   communications from the 812 number -- back to the defendant's

16   residence and then particularly to the defendant, especially

17   in light of the fact that he was using the IP -- the IP

18   address at the gym where he works out was used to access some

19   of the accounts here, which again would tend to exclude other

20   individuals who would be associated with that premises and

21   show that this was, in fact, the defendant.

22          Obviously, as I just discussed, the defendant has now

23   given a Mirandized recorded interview in which he has admitted

24   to this conduct.  So, we would submit that the weight of the

25   evidence, while that is, I think, the condition that is given

1    the least weight -- I mean, is given no weight by Pretrial --

2    the evidence here is overwhelming at this point.

3         Turning to the history and the characteristics of the

4    defendant, one of those is the defendant's mental condition.

5    And here, again, the defendant has admitted that he has no

6    control over this behavior, which he says stems from a need

7    for new material, and that he is willing to use that material

8    to masturbate several times per day, including at work.

9         Again, that shows someone who, despite being a

10   32-year-old -- an educated 32-year-old -- who has a steady job

11   as a manager, that he's someone who has been harboring a

12   significant problem, and has been able to conceal that from

13   his family and function at the same time.  But it also

14   suggests that he has, you know, created mechanisms to allow

15   him to keep on engaging in this conduct.  And I think that

16   there's a significant concern that we should expect this

17   conduct to continue.

18        The defendant does have family ties to Chicago he

19   does not have to Boston.  But even with respect to his family

20   ties in Chicago, again, he was living under the same roof here

21   as his father, who would be the custodian, and the defendant

22   was able to engage in this conduct even while living under

23   that same roof.

24        With respect to the nature and dangerousness of the

25   offense, again, there's very little, if anything, that

1  Pretrial can do to verify compliance with the conditions once

2  they are imposed.  And, so, I do think we have concerns that

3  even with these extremely stringent conditions being proposed

4  by the Court, that there is very significant risk that this

5  defendant would find a way to re-offend.  And that is because

6  this defendant has already exhibited, again, the ability to

7  terrorize people on other sides of the country using just a

8  very small, simple handheld device, easily concealed and

9  easily obtained, from the comfort of his own home.

10       So that even if we have in place location

11  restrictions of the type that the Court discussed, we

12  recognize that the Internet restriction, the device

13  restriction, those all are designed to prohibit him from doing

14  this.  But, again, there's -- all he would need to do would be

15  to obtain a phone to be able to continue this offense.

16       And the danger associated with this defense -- sorry,

17  with this offense -- you know, speaks for itself.  But I think

18  also relating to the statement submitted by the mother of

19  Minor A -- I won't read it in full or in detail, but she does

20  detail how her daughter has suffered, both physically and

21  emotionally; and that while her emotional scars cannot be

22  outwardly seen, that she may never be the same as a result of

23  this offense; that she's been robbed of her innocence, and

24  that she has been scarred for life.

25       And that's just one of the victims in this case.  It

1   is the victim described in the complaint.  But the defendant

2   himself has acknowledged that he also was engaging in similar

3   conduct that was targeted toward other individuals who told

4   him that they were minors.  And in response, he threatened to

5   expose them to their families.

6           So, the government submits that even if the

7   rebuttable presumption here is, in fact, rebutted, that no

8   combination of conditions can reasonably assure the safety of

9   the community in light of the very particular way in which

10  this particular defendant committed the offense of

11  exploitation of children, in violation of Title 18, United

12  States Code, Section 2251.

13          Turning to the government's argument with respect to

14  the risk of non-appearance, the standard there is

15  preponderance of the evidence.  And here we would note that,

16  again, defendant in this case has no ties at all to Boston

17  other than his conduct in this case, which is geared toward

18  the District of Massachusetts generally, as well as to other

19  places.  He is facing a 15-year mandatory minimum sentence for

20  one count of violating Section 2251.  And he admitted to

21  similar activity geared toward other victims.  And he also

22  would be facing a five-year mandatory minimum for the offense

23  of receipt of child pornography.

24          The defendant prior to the pandemic did travel

25  internationally on a regular basis, traveling to Mexico, I

1  believe for vacation purposes, but on an almost annual basis

2  for several years.

3          And we would also note that in the defendant's

4  Mirandized interview, although he ultimately admitted to this

5  conduct, he did make many statements in which he denied having

6  any knowledge of the Snapchat account in question; denied

7  having any knowledge of the various e-mail accounts and phone

8  numbers in question; and that the admissions he made came

9  after approximately two hours, indicating that the defendant

10 in this case also is still -- you know, has not fully accepted

11 responsibility at this point for his conduct.

12          And in the case of those mandatory minimums, we do

13 think -- and the lack of any ties to Boston -- we do think

14 that there is a -- that no combination of conditions can

15 reasonably assure his presence in Boston by a preponderance of

16 the evidence.

17          THE COURT:  Okay.  Thank you, Mr. Mott, for those

18 arguments.

19          Ms. Johnson, I'll give you an opportunity to respond.

20 And in particular, if you can work into your response Mr.

21 Mott's well-taken point that if there was release in this

22 case, travel, at least for some hearings, to Boston may be

23 necessary.  Presumably, some of it may be done telephonically.

24 But if you can work in how the defense thinks that proper

25 safeguards could be fashioned in the defense's view.

1          MS. JOHNSON:  Your Honor -- yes.

2          One point I do just want to make, the standard is not

3   risk of flight; it's serious risk of flight.  And as we

4   explained, the passport will be turned over.

5          In terms of him being -- traveling from here to

6   Boston, if the Court wanted to, his sister -- who is present

7   on the line and who is an attorney -- is willing to travel

8   with him to ensure that he, you know, isn't attempting to get

9   on Wi-Fi.  He will not have a smartphone with him.

10          In terms of these allegations, they seem -- all of

11   the allegations seem to arise from the use of the Internet.

12   Your Honor, I have not received discovery.  I've only received

13   the little that the government gave me.  But with that being

14   said, your Honor, with those stringent conditions in place, he

15   wouldn't have access to Wi-Fi.  He wouldn't have access to any

16   type of Internet-capable device.  And, so, with those in

17   place, there is a minimized risk of any danger to the

18   community.

19          THE COURT:  Okay.

20          Mr. Mott, anything you want to further respond to?

21          MR. MOTT:  I don't believe any further response to

22   that is required.

23          THE COURT:  Okay.  Very good.

24          So, thanks to both counsel for excellent, detailed

25   arguments that you both prepared.  The Court appreciates the

1    really good argument you made here.

2           So, as said I said, the Court is not making any

3    decision -- or detention decision -- today, in part, because I

4    want to hear from the family members who would be called upon

5    to have responsibility in this case:  Mr. Herrera's dad who is

6    proposed he would live with.  And that would be 24/7.  I mean,

7    his dad will also be -- needs to be home during all daytime

8    hours as a belt and suspenders to make sure Mr. Herrera does

9    not leave the residence and is not doing anything in

10   contravention of pretrial release rules.

11          Number two, his girlfriend, Ms. Artiago, would have

12   restrictions on what electronic devices she could have in the

13   building -- the contiguous building -- and the Wi-Fi.

14          And, then, to Ms. Johnson's last point, the Court

15   would require, if there was a release here, that Mr. Herrera's

16   sister or some other adult that's available would accompany

17   him on any and all travel necessary for court purposes.

18          And I want the family to go think about that.

19   Whether they want to do it.  Whether they're willing to take

20   on those responsibilities.  And I think the best way to

21   approach that is to give time to do that.  Also, as I said, I

22   do want Officer Tramonte to interview Ms. Artiago about the

23   electronic devices.

24          Officer Tramonte, would you be able to do that and

25   submit an addendum on that issue sometime tomorrow?

1           MS. TRAMONTE:  Yes, your Honor.  I will try to do

2    this today if possible, but certainly by tomorrow.

3           THE COURT:  Okay.  Super.  Thank you as always for

4    your work.

5           My proposal here would be to take an adjournment on

6    this until Wednesday at noon, is my proposed time.  But I'll

7    certainly hear from anyone on their schedules.  Wednesday at

8    noon would be my suggestion.  I would require -- as has been

9    achieved today -- Mr. Herrera's sister, girlfriend and father

10   be on the line, as if there was a release here, they'd have

11   quite significant responsibilities; and the Court would be

12   looking to inquire of them and admonish them if there was a

13   release.

14          Let me hear from counsel whether Wednesday at noon

15   would be doable from your perspective.

16          MS. JOHNSON:  Your Honor, this is Jasmine Johnson --

17          MR. MOTT:  Go ahead.

18          MS. JOHNSON:  Go ahead.

19          That time works for the defense.

20          THE COURT:  Okay.

21          Mr. Mott?

22          MR. MOTT:  Yes, the government's also available.

23          THE COURT:  Okay.  Very good.  So, we'll schedule for

24   Wednesday at noon.

25          Ms. Johnson, I realize that -- as you've already

1   really helpfully done, talk to the family.  If there's a

2   change in circumstances, if you could please let the Court

3   know and copy to Mr. Mott.  If there's a need for a different

4   day or time to accommodate -- I understand his dad is retired,

5   but accommodate the work schedules of Ms. Artiago and his

6   sister, the Court is certainly open to that.  I'm not trying

7   to have anyone miss work here.

8           Anything else the parties think we should address

9   before we take up the hearing on Wednesday?

10          MR. MOTT:  Not from the government, your Honor.

11          MS. JOHNSON:  Not from the defense.

12          THE COURT:  Okay.  Thanks, folks.

13          MR. MOTT:  Thank you.

14          MS. JOHNSON:  Thank you.

15                      *     *     *     *     *

16

17  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
18

19
    /s/ Joseph Rickhoff                    June 8, 2021
20  Official Court Reporter

21

22

23

24

25